E-FILED
Friday, 11 January, 2013  03:52:42 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 10-CR-20084-2** |
| **v.** | ) | |
| | ) | |
| **MELISSA S. BASHAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## OPINION

An attorney may not drop one client like a "hot potato" in order to avoid a conflict with another, more remunerative client.[1]

Suppose a criminal defense attorney represents an individual accused of a heinous crime. The attorney negotiates the plea bargain in an exemplary fashion, and so the defendant receives 19 1/2 years in prison rather than life. Several months later, the defendant (now prisoner) hears over the prison public address system that he has a legal phone call. Thinking that it is his attorney keeping tabs on him, perhaps with a plan to get him out sooner, he tolerates the catcalls and threats while running the gantlet and picks up the phone. Imagine his surprise when he discovers that not only is the call from an FBI agent, but an FBI agent asking how he feels about the fact that his attorney of one-and-a-half years is no longer his attorney, and instead is *representing his co-defendant*.

Surely a mistake has been made. Surely, the person with whom he had shared his confidences and confessions (especially regarding his transgression)—that wouldn't be the

---

[1] *Santacroce v. Neff*, 134 F. Supp. 2d 366, 370 (D.N.J. 2001). *See also ValuePart, Inc. v. Clements*, 06-C-2709, 2006 WL 2252541 at *2 (N.D. Ill. Aug. 2, 2006).

person now working zealously to get his co-defendant off the hook, now, would it? If so, when the government calls him to testify against his co-defendant (since they were both involved in the same crime), wouldn't his now-former attorney stand ready to cross-examine him? And even if the attorney delegated the cross to someone else, or if the co-defendant were to take a plea and avoid trial, is it really conceivable that the attorney could incontrovertibly, indelibly, and unerringly eradicate from his memory any and all secret and indispensable details that his now-former client had communicated to him in confidence?

The successive representation of two co-defendants suggests the very essence of a conflict of interest. If an attorney is loyal to his former client, he cannot single-mindedly pursue the goals of his new client. And if he zealously defends his new client, would he not, even assuming that he had his former client's best interests at heart, unconsciously rely on at least something that he learned from the former representation?

This case is before the court on the Government's Motion to Disqualify Defendant's counsel of choice, Lawrence S. Beaumont, due to an alleged conflict of interest with a former client. The court has reviewed the transcript of the evidentiary hearing and the briefs of both parties. Following that careful review, the court now GRANTS the Government's motion to disqualify Mr. Beaumont (#58).

## Background[2]

On May 5, 2010, law enforcement officers executed a search warrant on Defendant Mark Begley's residence. A DVD-R was seized that contained a pornographic video involving a minor female victim N.L. (born February 1988), engaging in a sex act with Defendant Melissa Basham.

---

[2] Facts are taken from the stipulated factual basis in Defendant Begley's plea agreement.

During the video, Begley is heard operating the camera and instructing the minor female and Basham to perform certain sex acts. In an interview, N.L. stated to law enforcement officers that the video was shot sometime in 2003, which would have made her around 15 years old. In a different interview, Basham admits that she is the adult female in the video and that she thought the video was shot in 2004, which would have made N.L. around 16 years old. Basham admits to having performed the sex acts with N.L.

In addition to the DVD-R, law enforcement officers seized a computer from Begley's residence containing pornographic photographs of a second minor female, J.R., born January 1990. In an interview, J.R. states that Begley had taken those photographs, and that she had been between 16 and 17 years old at that time.

On October 18, 2010, the Government filed a complaint against Mark Begley, charging two counts of producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1 and 2), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 3). The same day, Mr. Beaumont entered his appearance for Begley. The next day Begley and Basham were indicted for the sexual exploitation of a child. Basham was charged with one count of producing child pornography (Count 1). A month later, Federal Public Defender Mr. John Taylor entered his appearance for Basham.

On February 25, 2011, Melissa Ann Matuzak entered her appearance for Begley. On December 15, 2011, Begley entered into an agreement with the Government in which he would plead guilty to the two § 2251 production counts (Counts 1 and 2) and the Government would drop the § 2252 possession count (Count 3). On April 2, 2012, this court entered judgment against Begley and sentenced him to a term of 235 months on each of Counts 1 and 2, to run concurrently.

On June 19, 2012, Mr. Beaumont entered his appearance for Basham and Mr. Taylor withdrew. On June 22, 2012, the Government filed the present Motion to Disqualify Counsel (#58). On June 26, 2012, Basham filed her response. On August 2, 2012, Begley filed, through Ms. Matuzak, an Emergency Motion to Stop Transfer from Federal Custody for Live Testimony. In it, Matuzak argues that neither a written order nor a signed writ was issued by this court directing the Bureau of Prisons to transfer Begley from his location of incarceration in Pennsylvania back to the court in order to testify in person. Instead, Matzuak asserts that the Government filed an internal memo to procure Begley's transfer. Notably, this is the first filing on record by Matuzak on Begley's behalf. On the same day, this court granted that motion and instead allowed Begley to appear by telephone.

On August 30, 2012, this court held an evidentiary hearing. Present at that hearing were: the Government, represented by Ms. Peirson; Basham, who appeared in person and with counsel Mr. Beaumont; Begley, by telephone, who was represented by Ms. Matuzak; Mr. Taylor; and Cheri Proctor, Mr. Taylor's office assistant and legal secretary. Testimony was heard from Begley, Basham, Proctor, Taylor, Peirson, and Matuzak.

On November 1, 2012, the Government filed its memorandum with proposed findings of fact and conclusions of law. A response was filed by Basham on December 17, 2012.

**Findings of Fact**

1. Begley had initially retained Mr. Beaumont in early May 2010 regarding unrelated state court charges (#66, Transcript, 16 (hereinafter "Tr.")). Mr. Beaumont's ongoing representation continued in the present case when he appeared as the attorney of record at Begley's initial appearance on October 18, 2010 (#4). Mr. Beaumont signed Begley's

plea agreement on December 14, 2011; there was no signature for Ms. Matuzak although her name was typed on the form (#34). Mr. Beaumont was the only attorney present during Begley's sentencing hearing on March 30, 2012 (Minute entry of March 30, 2012; Tr. 6-7).

2.  Sometime between June 19, 2012 and June 22, 2012, FBI Special Agent Ted Weber, who had participated in the original investigation, contacted Begley in prison with several questions regarding Begley's understanding of the extent of the relationship between Mr. Beaumont and himself. (#58 ¶¶ 12-13).

3.  Begley testified that he was not aware that Mr. Beaumont had treated the relationship as terminated until his conversation with Agent Weber. (Tr. 18).

4.  Begley testified that Mr. Beaumont not only had not contacted him since the sentencing hearing, (Tr. 19), but also had not explicitly informed him that he was no longer acting as his attorney (Tr. 9).

5.  Begley testified that when he received the phone call from Agent Weber, he was still under the impression that Mr. Beaumont was handling his representation. Begley testified as follows:

>  THE COURT: Who did you think your attorney was at that time [when you received the call from Agent Weber]?
>
>  DEFENDANT BEGLEY: It wasn't, it wasn't a thought. I know it was Larry Beaumont. Larry Beaumont was my attorney, always been, for over the last year and a half—
>
>  THE COURT:  Okay.
>
>  DEFENDANT BEGLEY: —and has been from the get-go on this.

- 5 -

> THE COURT: So would it be fair to say you had no contact with Mr. Beaumont about entering his appearance in the Melissa Basham case?
>
> DEFENDANT BEGLEY: No. When Mr. Weber brought it to my attention that Larry had just filed a—or entered as her lead attorney, I was, I was kind of shocked/surprised. I was like: What is this? What—I didn't know if this was some kind of—I didn't know what it was, to be honest with you. But, no, that's how I found out. I found out from Mr. Weber.
>
> (Tr. 9-10).

Later, Begley testified as follows:

> THE COURT: Let me, let me ask you this question: When you called Ms. Matuzak, did she say to you, "I just want to let you know, Mark, that I no longer represent you"? She—or did she say anything like that?
>
> DEFENDANT BEGLEY: No. She said absolutely—matter—she said nothing of that sort to me. Matter—as a matter of fact, I, I believe that she was looking into this and saying—I mean, because she had called here again. We had—when we had spoke, she, she said she was—you know, she does—I think I—I believe it was that time that I spoke to her on the phone; she said, "I am your attorney." You know, she—so—I was, I was kind of freaking out, as Ms. Peirson said. Yeah, it was a completely weird situation to have Mr. Weber calling me and then to find out that my attorney was now Melissa Basham's attorney. So, yeah, I—when I called her, it was just kind of—I don't want to say surreal. It was just kind of weird. I didn't expect that.
>
> (Tr. 24).

Begley also testified that when Agent Weber told Begley that Mr. Beaumont had filed an appearance for Basham, Begley "about fell out of [his] chair when [Agent Weber] said it." (Tr. 20). Further, he indicated as follows:

> I don't want to say that I felt betrayed by him by finding out through Mr. Weber; but, yeah, it was a—it was quite a shock to the system. [ . . .] [T]hat was probably one of the last things that I needed to hear was that my, my attorney—basically, he said that he wasn't my attorney no more.
>
> (Tr. 32-33).

6.  Begley testified that he had routinely engaged in confidential discussions regarding his case with Mr. Beaumont. He had "conversations with Mr. Beaumont and Ms. Matuzak in regards to my case, all levels of it, defense, strat— you know, the different aspects of it, including credibility." (Tr. 33). He also testified as follows:

> Q. Okay. Did you feel that when—during the course of Mr. Beaumont representing you that that was safe place for you to talk about your case and discuss trial strategy, whatnot? That, that your communications with Mr. Beaumont were sacred; they were safe to you?
>
> A. That's, that's—matter of fact, I'm sure Mr. Beaumont will testify to this. I probably overkilled the question to him: Is this a secure line? Can we—can I speak frankly and freely to you without repercussions of any kind because I don't—I wanted to know that. I asked that all the time to make sure because I knew that he was my attorney, and I could speak to him frankly, say things to him and/or to Ms. Matuzak. And I've even asked Ms. Matuzak on several occasions: Now, I can speak freely; they can't record this here just because it is privileged? And that's exactly what I expected it to be.
>
> Q. And, and did you take advantage of the relationship you had with Mr. Beaumont, meaning—and I don't want you to tell me the contents of it; but did you speak to him freely and safely, sharing with him the confidences you had in this case, the confidential information you had in this case with regard to your trial strategy, credibility of witnesses, challenges to the government's case?
>
> A. Absolutely. And we've did—we did that when I was on home incarceration. We had a couple meetings, both Larry and I—both Larry and Ms. Matuzak and myself and—yeah. We had—that's exactly what all of—you know, that's what we did that for. Yes. I spoke very frankly, and we discussed strategy, this or that, or—you know, that's exactly what we did.

> (Tr. 30-31).

7.  Begley does not waive any conflict of interest that Mr. Beaumont has by representing Basham. He testified as follows:

> Q. Okay. Now, given that, would you—do you waive any conflict of interest that Mr. Beaumont may have because of his prior relationship with you in order for him to represent Ms. Basham?

[ * * * ]

A. So, no, I am not—I would not feel comfortable signing something
   waiving a conflict of interest because I, I believe it's huge.

Q. So you do not consent to—

A. I do not—absolutely not.

Q. —Mr. Beaumont representing Ms. Basham?

A. No. No, ma'am. I don't.

(Tr. 32-33).

8.  Begley has also discussed with Matuzak the possibility of testifying for the
Government against Basham, but has not yet decided whether he will do so. (Tr.
34-35). Begley's plea agreement does not have a cooperation clause requiring him
to testify at the Government's request. (#34).

9.  After a careful examination of Begley's testimony via telephone, this court
concludes that Begley's testimony during the evidentiary hearing was credible
and that his manner and demeanor displayed no indicators of evasion or
untruthfulness.

10. Mr. Beaumont avers that he had no contact with Basham until after Begley had
been sentenced and incarcerated. (#70 ¶ 1). Mr. Beaumont also avers that he had
no contact with Begley until after the time would have elapsed for him to file an
appeal, and besides, Begley waived his right to file an appeal in his plea
agreement. (#70 ¶ 1).

11. Begley's plea agreement does not contain any language requiring him to testify on
behalf of the government or to otherwise cooperate.

12. Mr. Beaumont has indicated that, should the present case be contested, whether at trial or otherwise, Keri Ambrosio,[3] a criminal defense attorney, has agreed to cross-examine Begley. (#61 ¶ 4).

13. Ms. Matuzak testified that Begley was given an opportunity to cooperate in February 2011, three or four months after she became involved in the case. (Tr. 106).

14. Ms. Matuzak testified that the Government's offer of cooperation centered around the source of the images that were recovered from Begley's computer, and did not involve his testimony against Basham. (Tr. 107).

15. Ms. Matuzak testified that she believed that Basham was being offered a cooperation deal. (Tr. 109). She further testified that, in her experience, individuals who are cooperating with the government are likely to plead guilty rather than go to trial. (Tr. 109).

## Analysis and Conclusions of Law

The Sixth Amendment guarantees every criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). However, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."

---

[3] In his filing, Mr. Beaumont spells the name of the attorney as "Carrie Ambrosio". No such attorney appears in the Illinois Attorney Registration and Disciplinary Commission database. However, a "Keri A. Ambrosio," admitted to the Illinois bar on May 10, 2001, with a business address of 53 W. Jackson Blvd., Suite 1650, Chicago, IL 60604, does appear. For the purpose of this motion, this opinion shall assume that the individual in question is Keri A. Ambrosio and shall refer to her as such. As an aside, Ms. Ambrosio's address is identical to the address provided for Ms. Matuzak.

*Wheat v. United States*, 486 U.S. 153, 159 (1988). While there is a Sixth Amendment

presumption in favor of a defendant's counsel of choice, the right to choose one's own counsel is

not absolute, and, thus, the presumption may be overcome. *Id*. at 158-59, 164.

Specifically, "a defendant's choice of counsel may be overridden and counsel may be

disqualified where an actual conflict of interest or a serious potential for conflict exists." *United*

*States v. Turner*, 651 F.3d 743, 749 (7th Cir. 2011). It is more difficult to disqualify counsel in a

case involving successive representation when only a potential conflict of interest exists, because

the defendant must also show that he had been prejudiced by the conflict of interest. *Hall v.*

*United States*, 371 F.3d 969, 973 (7th Cir. 2004). The bar is lower when there is an actual

conflict of interest, because in that scenario, the Sixth Amendment is only violated when the

actual conflict merely adversely affects the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S.

335, 350 (1980). This is because "prejudice is presumed if the petitioner establishes both that his

counsel had an actual conflict and that the conflict had an adverse effect on counsel's

performance." *Hall*, 371 F.3d at 973. Thus, *Cuyler* requires a both an actual conflict of interest

and an adverse effect on the lawyer's performance. *Stoia v. United States*, 22 F.3d 766, 770 (7th

Cir. 1994).


*Actual conflict of interest*

An actual, as opposed to a potential, conflict of interest exists when "the defense attorney

was required to make a choice advancing his own interests to the detriment of his client's

interests." *Stoia*, 22 F.3d at 771. *See also United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir.

1995) (defining an actual conflict of interest as "when, during the course of the representation,

the attorney's and defendant's interests diverge with respect to a material factual or legal issue or

to a course of action."). When an actual conflict exists, the district court may not apply a *per se* rule for disqualification, but rather, must evaluate the interests of the defendant, the government, the witness, and the public in view of the circumstances of each particular case. *United States v. O'Malley*, 786 F.2d 786, 790 (7th Cir. 1986). This evaluation may take place in the context of an evidentiary hearing, which this court has already held, and may be memorialized in findings of fact, which this court now makes in this opinion. *See Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1064 (7th Cir. 1994).

There are three methods to determine whether an actual conflict of interest occurs when an attorney is involved in successive representation. First, "where counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant." *Enoch v. Gramley*, 70 F.3d 1490, 1496-97 (7th Cir. 1995) (*citing Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987)) (editing marks omitted). Second, "where counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." *Id*. And third, "a conflict that amounts to a breach of the code of professional ethics obviously qualifies as an actual conflict of interest of the sort that allows the trial court to disqualify counsel regardless of a defendant's offer to waive. *United States v. Turner*, 651 F.3d 743, 749 (7th Cir. 2011).

The Seventh Circuit has described the first test, which gauges whether a "substantial relationship" exists, as follows:

> First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make the disqualification proper.

- 11 -

*Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1064 (7th Cir. 1994); *LaSalle Nat. Bank v. Lake County*, 703 F.2d 252 (7th Cir. 1983). Here, there is no question that a substantial relationship exists between the subject matter of the prior and present representations. In Count 1, both Begley and Basham were charged with the same offense. Begley's statement of facts in his plea agreement, which was based in part on averments by Basham, admitted that Basham had engaged in the improper conduct while Begley contemporaneously managed and directed the filming. As Mr. Beaumont had represented Begley throughout the pendency of his defense, he participated in the entire litigation process; he now seeks to represent Basham in her defense of the same charge. Accordingly, there is a substantial relationship between the two matters.

The next stage of the burden-shifting framework described in *Cromley* echoes the second test, in which "counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." *Enoch*, 70 F.3d at 1497. Whether Mr. Beaumont can rebut the presumption of shared confidences is related to whether he learned of any confidential information. In his defense, Mr. Beaumont argues that he does not possess any confidential information regarding the shared count. (#61 ¶ 5). But not only is this claim incredible, given their association over one and a half years, but there are other factors in opposition. Begley testified that he communicated to Mr. Beaumont substantial and material information that he considered highly confidential. Mr. Beaumont responds that he has not discussed any confidential information with Ms. Ambrosio, who will be doing the cross. But Mr. Beaumont has already breached his proposed firewall by revealing confidential discussions not yet in the public record. For example, Mr. Beaumont discussed the substance of negotiations with the government regarding Begley's plea agreement (#60 ¶3), as well as the reasons why

Begley chose to change his plea to guilty. (#61 ¶ 9). As to the specific nature of any other

confidential information, the court is not permitted to inquire into those communications, lest it

penetrate the attorney-client privilege itself in doing so and destroy those confidences. *See*

*Schloetter v. Railoc of Ind., Inc.*, 546 F.2d 706, 710 (7th Cir. 1976); *MPL, Inc. v. Cook*, 498 F.

Supp. 148, 150 (N.D. Ill. 1980). Therefore, based on Begley's testimony, and Mr. Beaumont's

inability adequately to rebut the presumption of shared confidences, this court must presume that

counsel learned of particular confidential information relevant to Basham's case during his

representation of Begley. *See United States v. Provenzano*, 620 F.2d 985, 1004-05 (3d Cir. 1980)

("[A]lthough the district judge did not make explicit findings that Eisenberg knew specific facts

that would have involved him in conflict, the district court correctly concluded that he must

assume as much, since he could not actually inquire about the matter without thereby himself

destroying the confidence.").

Last, a breach of the code of professional ethics qualifies as an actual conflict of interest

sufficient to disqualify an attorney. *Turner*, 651 F.3d at 749. Local Rule 83.6(D) requires that

"[t]he Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct

adopted by the Supreme Court of Illinois…." Illinois Rule of Professional Conduct 1.9(a) states,

as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter
> represent another person in the same or a substantially related matter in which
> that person's interests are materially adverse to the interests of the former
> client unless the former client gives informed consent.

The two matters are the same as Begley and Basham both were involved in the same

filming incident. The Government has indicated that it will call Begley to testify against Basham

in the event they go to trial. Last, Begley did not give informed consent to Mr. Beaumont's

representation of Basham. Thus, pursuant to Rule 1.9(a), Mr. Beaumont is not ethically permitted

to represent Basham.[4] Having found that an actual conflict exists, this opinion proceeds to

discuss whether an adverse effect occurred.[5]


   *Adverse effect*

   An adverse effect may be demonstrated by showing that there is a reasonable likelihood

that the conflicted counsel's performance would be different had there been no conflict of

interest. *Hall v. United* States, 371 F.3d 969, 974 (7th Cir. 2004). Historically, when a former

---

[4] While the existence of a former client's successive conflict of interest conditionally necessitates the power to disqualify his former attorney from representing a subsequently-conflicted client, a conflict of interest is not coextensive with the Sixth Amendment right to effective assistance of counsel. *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct."); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("Prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable, but they are only guides.") (citations omitted).
   Although no cases could be found explicitly stating so, this observation foreshadows the upcoming discussion over whether an adverse effect is required to disqualify an attorney.

[5] Begley's surprise upon hearing that Mr. Beaumont no longer represented him is also curious. On one hand, "[i]f a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved," Ill. R. Prof. Conduct 1.3 cmt. 4, and "[o]rdinarily, representation in a matter is completed when the agreed-upon assistance has been concluded," Ill. R. Prof. Conduct 1.16 cmt. 1. But by the same token, the rules also indicate that
   [i]f a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so.
Ill. R. Prof. Conduct 1.13 cmt. 4. In addition, the Rules suggest that
   [u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel…
Ill. R. Prof. Conduct 1.16(d). Given that Mr. Beaumont represented Begley in—as far as has been suggested—two separate matters, but that the terms of their engagement have not been provided, the court shall not guess as to whether an objective observer would expect the representation to have terminated at sentencing. But Begley's testimony makes it clear that Mr. Beaumont did not give him any notice that his primary attorney had changed from Mr. Beaumont, with his many years of experience, to Ms. Matuzak, who, although having previously been part of his defense "team," had only been accepted to the Illinois Bar in 2010 and is, according to the Illinois Attorney Registration and Disciplinary Commission website, a member of a different firm.

client becomes a Government witness against the attorney's new client, courts have been primarily troubled by the prospect of an attorney being torn between his duty of confidentiality to his former client and his duty of loyalty to his new client. *See, e.g.*, *Nix v. Whiteside*, 475 U.S. 157, 188 fn. 7 (1986); *United States v. Sanchez Guerrero*, 546 F.3d 328, 334-35 (5th Cir. 2008); *United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir. 1975). By stating that another attorney will handle Begley's cross-examination, Mr. Beaumont attempts to erect a firewall between himself and his former client, thereby eliminating any possible adverse effect. Mr. Beaumont also argues that it is not certain that Basham will pursue a trial rather than a plea agreement, or that Begley will agree to testify on the Government's behalf and therefore no cross-examination of Begley will be necessary. This is especially pertinent since Begley's plea agreement does not contain a cooperation clause. On the other hand, the Government takes the position that it will definitely seek Begley's testimony against Basham. The Government has an effective method to create an adequate incentive to accomplish that goal should it choose to use it. *See* Fed. R. Crim. P. 35(b).

Here, the problem is not so much that Mr. Beaumont's performance on behalf of Basham will be *impaired* by his prior representation of Begley (by failing to cross him adequately), or, alternately, that Begley will somehow be adversely affected (seeing that his trial has concluded, he has been sentenced, and he is already incarcerated, and Mr. Beaumont avers that he did not contact Basham until after Begley was sentenced) but rather, that there is a very strong likelihood that despite his best efforts, Mr. Beaumont will not be able to prevent himself from leveraging information that he gained during his representation of Begley*, in Basham's favor.*

Thus, Mr. Beaumont's suggestion that a different attorney, firewalled from any information protected by the attorney-client privilege, would cross-examine Begley is ingenious.

He argues that this would be an adequate solution, wherein Begley's confidences would be maintained and a full and zealous cross-examination would be conducted based on information in the public record. *See United States v. Jeffers*, 520 F.2d 1256, 1266 (7th Cir. 1975) ("There is no reason to assume that in a matter of a few days a new lawyer could not have prepared an adequate and thorough cross-examination of [the conflicted witness].") This court was able to find one case with similar, but not identical facts. The attorney in *Sanchez Guerrero* suggested that he could hire another attorney to cross-examine a witness whom he had previously represented at trial, and that he would not inform that attorney of any confidential information he had gleaned from his previous representation. *United States v. Sanchez Guerrero*, 546 F.3d 328, 334 (5th Cir. 2008). The Fifth Circuit rejected the proposal because, at the core, the attorney would still have a conflict of interest between attempting to discredit his former client and going easy on him to the detriment of the new client. *Id*. That court based its decision on its prior holding in *United States v. Gharbi*, in which the attorney proposed a similar arrangement. 510 F.3d 550, 552 (5th Cir. 2007). Among other things, the court in *Gharbi* affirmed the attorney's disqualification, reasoning that if the attorney there had attacked the witness with great detail (who had been contemporaneously represented by co-counsel), it would jeopardize the witness's plea agreement. *Id*. at 553.

After considering these cases, this fact pattern presents a boundary condition. It is not clear what, if any, confidential information Mr. Beaumont has received from Begley, although we must presume that, during a representation spanning a year and a half, there must have been something communicated that was not subsequently revealed in the public record. Even if there was some confidential information that had been communicated, proposing Ms. Ambrosio for Begley's cross-examination eliminates the possibility of a head-to-head conflict of interest.

Regarding any effect on Begley, he is neither subject to a plea bargain that may be jeopardized by a harsh and detailed cross-examination, nor is he subject to a cooperation agreement obligating him to testify. Further, it is uncertain how Mr. Beaumont might be able to leverage that information to Basham's benefit in any another proceeding, including a plea bargain. Finally, and with apparent dispositive effect, neither party has suggested, and this court cannot imagine, a scenario in which Begley would subjected to any adverse effect. Notably, this court is not even permitted to inquire into many of these questions. *See Schloetter v. Railoc of Ind., Inc.*, 546 F.2d 706, 710 (7th Cir. 1976); *MPL, Inc. v. Cook*, 498 F. Supp. 148, 150 (N.D. Ill. 1980).

That having been said, it appears that an adverse effect may not actually be a requirement for disqualification. Although no opinion could be found explicitly stating so, a closer examination of the cases cited by the parties and discussed in this opinion so far reveals that the moving party has been required to show an adverse effect only when the issue is raised during consideration of a post-conviction remedy. *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335 (1980) (§ 2254); *Hall v. United States*, 371 F.3d 969 (7th Cir. 2004) (§ 2255); *Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995) (§ 2254); *Stoia v. United States*, 22 F.3d 766 (7th Cir. 1994) (§ 2255). In contrast, cases in the trial court or involving a direct appeal of a disqualification in this Circuit do not require the movant to demonstrate an adverse effect in order to merit disqualification. *See, e.g.*, *United States v. Turner*, 594 F.3d 946, 947 (7th Cir. 2010) (direct appeal); *United States v. Algee*, 309 F.3d 1011, 1012 (7th Cir. 2002) (same); *United States v. O'Malley*, 786 F.2d 786, 788 (7th Cir. 1986) (same); *United States v. Clark*, 333 F. Supp. 2d 789, 796 (E.D. Wis. 2004) (trial opinion); *Van Jackson v. Check 'N Go of Illinois, Inc.*, 114 F. Supp. 2d 731, 732 (N.D. Ill. 2000) (same); *United States v. Ring*, 878 F. Supp. 134, 135 (C.D. Ill. 1995) (same); *United States v. Messino*, 852 F. Supp. 652, 654 (N.D. Ill. 1994) (same). A distinction between the two situations

makes sense, because no one could be subject to an adverse effect at this point. Begley cannot claim that a conflict of interest with Basham caused him to receive ineffective assistance of counsel, because Basham did not retain Mr. Beaumont until after Begley was sentenced. And so Mr. Beaumont could not have logically acted in Basham's favor and to Begley's detriment. Clearly Basham does not want for her own attorney to be disqualified. Hypothetically, if Mr. Beaumont had not stated that Ms. Ambrosio would cross-examine Begley, and if Begley's plea agreement had a cooperation clause, it would still be impossible to disqualify Mr. Beaumont if an adverse effect was required. This cannot be the case. Disqualification for successive conflict of interest at the pre-trial stage therefore cannot require an adverse effect.

This conclusion is also supported by the reasoning in *United States v. O'Malley*, 786 F.2d 786 (7th Cir. 1986). In *O'Malley*, the government sought to disqualify an attorney in a criminal case, on the ground that he had previously represented a key prosecution witness in two matters. The new client argued that his attorney should not be disqualified because they had worked together for the prior seven years in a number of matters, and because the former client had not joined the government's motion for disqualification. *Id*. at 788. In favor of disqualification was that the witness had made it clear in an affidavit that he felt there was a substantial risk of intrusion on his attorney-client privilege. *Id*. at 792. The Seventh Circuit opined that it was this fear of intrusion on the confidential communications between an attorney and his or her client, rather than the fear of an inadequate cross-examination, that was effectively the true focus of the inquiry. *Id*. at 792. In upholding the disqualification, the Seventh Circuit held that

> [g]iven the problem of verifying whether [the attorney] gained knowledge of any particular instance of misconduct by [the former client] that might be used at trial from an "independent source" or through his representation of [the former client], we do not think it is likely that any prophylactic measure would have adequately protected [the former client's] attorney-client privilege.

*O'Malley*, 786 at 793. The court went on to rule that an *in camera* hearing to determine whether the attorney actually possessed any sensitive and confidential information by virtue of his prior representation was not constitutionally required. *Id*. Instead, the district judge was required to "determine only whether confidences useful to the defendant could potentially have been revealed during the attorney's prior representation of the witness." *Id*. That possibility could be "determined by examining the nature of the prior representation and the probable nature of the examination of the former client at the defendant's trial." *Id.* The first part of that query involves whether an actual conflict exists (which has already been found in the affirmative), while the second part involves the likelihood that the attorney will have to cross his former client. As discussed earlier, Mr. Beaumont has already revealed at least some information that normally would not be part of the public record, including Begley's reasons for accepting the plea agreement. Thus, under this interpretation, a finding of adverse effect is not necessary to disqualify Mr. Beaumont.

A comparison with *United States v. Turner*, 594 F.3d 946 (7th Cir. 2010) is helpful to distinguish when an actual conflict of interest is sufficient for disqualification (not to be confused with the previously-discussed *Turner*, 651 F.3d 743 (7th Cir. 2011)). In *Turner (2010)*, the Seventh Circuit held that a *per se* rule against joint representation is not permissible. *Id*. at 948. There, two co-defendants had the same attorney. The government suggested that there might be an insurmountable conflict of interest because one defendant might cooperate with the government against the other. However, because neither client wanted to assist the government and both defendants waived any conflict of interest, *id*. at 947, the court held that there was only a potential conflict, not an actual one. The court then distinguished *United States v. Algee*, in which it affirmed disqualification, on the ground that the attorney had previously represented two

co-conspirators who the government intended to call to testify as principal witnesses against the defendant. 309 F.3d 1011, 1014 (7th Cir.2002). Here, the Government has said that it will definitely request that Begley testify against Basham. Further, Begley clearly does not waive the conflict of interest. But the question remains whether this case will ever proceed, much less need to proceed, to the point where Begley will be required to testify against Basham.

One final factor that this court is required to consider is the likelihood that the Government is seeking to "manufacture" a conflict in order to prevent a defendant from having a particularly able defense attorney at his side. *Wheat v. United States*, 486 U.S. 153, 163 (1988); *see also Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982) (noting that motions to disqualify counsel "should be viewed with extreme caution for they can be misused as techniques of harassment."). This court finds harassment or unethical motives to be a highly unlikely proposition. First, Ms. Peirson (for the Government) and Mr. Beaumont have both appeared before this court in the past. (A quick search shows at least nine opinions issued by this court involving Mr. Beaumont and ten involving Ms. Peirson.) Both have been the very model of ethical uprightness. Neither has contested a motion to disqualify in this court before.

Ultimately, the difficulty that this court faces is that of evaluating the degree of risk that confidential information would be misused, in light of presumptions and policies pulling in opposite directions. On one hand, a defendant has a presumptive right to counsel of his own choice, and the trial court should defer to that choice. In the case of confidential information, "the courts can generally rely on the sound discretion of members of the bar to treat privileged information with appropriate respect." *United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir. 1975). On the other hand, the trial court is obligated to evaluate the interests of the defendant, the government, the witness, and the public. In the former Code of Professional Responsibility,

- 20 -

Canon 9 warns attorneys to avoid even the appearance of impropriety with regard to ethical violations. While no similar rule exists in the current Rules as adopted by the Illinois Supreme Court, the sentiment must still govern this profession. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988); *United States v. Smith*, 618 F.3d 657, 666 (7th Cir. 2010). If the probability that a conflicted attorney actually received confidential information is low, and the purpose for which that information can be used is insignificant, then, certainly, "[t]he risk that an item of confidential information might be misused does not create a conflict of interest." *United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir. 1975). But this court is not permitted to hear confidential details of their relationship. Thus, as the Supreme Court noted, we must decide whether to allow the conflict of interest to stand "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat*, 486 U.S. at 162.

The Northern District noted over thirty years ago that "[b]ecause the most honorable lawyer cannot perform a frontal lobotomy on himself, he cannot be presumed to engage in the new representation and carry out his obligation of undivided fidelity to the new client without the use consciously or subliminally of the confidences and secrets reposed in him by the old client." *MPL, Inc. v. Cook*, 498 F. Supp. 148, 151 (N.D. Ill. 1980). The decision to override Basham's choice of counsel is not taken lightly, given that the constitutional right to counsel of choice is at stake. But with the specter of an ineffective assistance claim looming ahead, this court finds that its best exercise of discretion is to take the step of disqualification.[6]

---

[6] Because disqualification is now ordered, this court is no longer required to forward a copy of this opinion to the Illinois Attorney Registration and Disciplinary Commission to allow it to determine

IT IS THEREFORE ORDERED THAT:

(1) The Government's Motion to Disqualify (#58) is GRANTED.

(2) Defendant Basham is allowed until March 12, 2013 to find new counsel because Mr. Beaumont entered his appearance on her behalf on June 19, 2012, thereby creating the instant conflict of interest, which was presented to this court and ruled on in this motion.

Defendant Basham is ordered to personally appear in this court for a status conference on March 12, 2013 at 1:30pm with her new counsel. This appearance is a condition of her bond. Because this court is obligated to disqualify Mr. Beaumont from representing Defendant Basham as a result of his appearance and subsequent conflict of interest, the court finds that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial, and that the period of delay from June 19, 2012, to March 12, 2013, shall be excluded from the time limits for commencing trial, pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (B)(iv).

Entered this 11th  day of January, 2013.

s/MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE

---

whether a violation of the Rules of Professional Conduct had occurred. *See Wexler v. City of Chicago*, 1994 WL 268632 at *6, fn. 7 (7th Cir. 1994) (unpublished).